**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>    vs.<br><br>JULIO REYES,<br><br>        Defendant. | A02-102 CR (HRH)<br>**3:02-cr-00102-02-HRH-JDR**<br><br>**RECOMMENDATION**<br>**REGARDING**<br>**MOTION TO VACATE**<br><br>(Docket No. 309) |

Defendant **Julio Reyes** moves to vacate his sentence pursuant to 28 U.S.C. § 2255, Docket No. 309.[1] The motion is opposed by the government. *See* Answer to First Amended Motion for Relief Pursuant to 28 U.S.C. § 2255, Docket No. 326. Reyes contends that his trial counsel rendered ineffective

---

[1] The first Amended Motion to Vacate filed April 25, 2005 at Docket No. 309 superseded an earlier motion to vacate filed by Reyes, pro se, at Docket No. 216.

assistance of counsel. An evidentiary hearing was conducted before the assigned magistrate judge. The parties filed written summations at Docket No. 353 (government) and Docket No. 355 (defendant). Upon due consideration of the evidence and arguments and record herein the magistrate judge submits proposed findings of fact and conclusions of law recommending that the defendant's motion to vacate be denied.

## Procedural History

Reyes was initially indicted in a seven count indictment with co-defendants Altagracia Esther Perdomo, Nayade Perez and Paino Manuel Alverez-Perdomo. The seven count indictment was filed October 31, 2002 at Docket No. 1. At the initial arraignment Reyes qualified for court appointed counted and Herman Walker, Esq. was appointed to represent him. *See* Appearance of Walker filed November 14, 2002, Docket No. 17.

Julio Reyes was charged in a eight court superseding indictment (Docket No. 85) together with co-defendants Altagracia Esther Perdomo and Paino Manuel Alverez-Perdomo, with conspiracy to possess with intent to distribute both five kilograms or more of a substance containing a detectable amount of cocaine and 50 grams or more of a substance containing a detectable amount of cocaine base in violation of 21 U.S.C. § 846, 841(a)(1) and 841(b)(1)(A) (Count 1). Reyes was also charged in Count 7 with possession/distribution of controlled substance of

five grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. § 2.  For Count 1 Reyes faced a maximum penalty of incarceration of ten years to life.  For Count 7 the exposure for incarceration was 5 to 40 years.

On August 7, 2003 Reyes pled guilty pursuant to a plea agreement to Count 7 of the Superseding Indictment to the charge of possession/distribution of a controlled substance.  *See* Court Minutes, Docket No. 145.  Imposition of Sentence set for October 23, 2003 was vacated and reset for December 4, 2003.  Docket No. 156.  Mr. Walker filed a sentencing memorandum on behalf of Reyes on December 2, 2003.  Docket No. 169.  At sentencing held December 4, 2003, Reyes' sentence included imprisonment for a term of 60 months.  Docket No. 170.[2]  At sentencing Judge Holland imposed the lowest sentence permitted under the law in the absence of invocation of the "safety valve" or a government motion pursuant to § 5K1.1 of the U.S. Sentencing Guidelines or 18 U.S.C. § 3553(f).

On June 4, 2004 Reyes filed a pro se motion to vacate pursuant to 28 U.S.C. § 2255 and requested appointment of counsel.  William C. Broberg, Esq. was appointed to represent Reyes in his post-conviction motion.

//

---

[2] Sentencing occurred before the Supreme Court decided Blakely v. Washington, 542 U.S. 296 (2004).

## Issues

As grounds for relief in the § 2255 motion Reyes asserts that his trial counsel Herman Walker rendered ineffective assistance of counsel in violation of the Sixth Amendment because he did not adequately explain or pursue the "safety valve" sentencing option on Reyes' behalf. He claims that he spoke with government agents and answered their questions truthfully. In a memorandum filed prior to the evidentiary hearing Reyes points out that Walker did not know prior to the change of plea hearing that the "safety valve" was still available up to the time of actual sentencing and that Walker did not prepare him for sentencing by adequately explaining the application of the safety valve to him. Reyes claims that Walker told him that if he cooperated he could get less than 18 months to serve. Reyes faults his attorney for not discovering from the government what information they sought from him that he had not provided. Reyes claims that his understanding prior to sentencing was that it was up to his attorney, not him to do something in order to get the safety valve departure.

Reyes acknowledges that Walker talked to him about cooperating and that his understanding was that if he did cooperate he would get less than 60 months. Reyes claims that he would have talked to the government if he had known what he had to tell them. He faults his attorney for not telling him what he had to tell the agents in order to qualify for the downward departure. Reyes maintains that he

answered all the questions asked of him at the debriefing with the government agents. Thus, Reyes claims, he did not know whether he had cooperated sufficiently to meet the expectations of the government agents.

### Standard for Ineffective Assistance of Counsel Claims

Ineffective assistance violates the Sixth Amendment right to the assistance of counsel. Claims are subject to analysis under the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984). A claim of ineffective assistance of counsel on appeal is also evaluated under the same two-part test enumerated in Strickland. See United States v. Birtle, 792 F.2d 846 (9th Cir. 1986).

The Strickland analysis requires that the criminal defendant show not only that his attorney's representation was deficient but also that the attorney's representation prejudiced his cause. Id. at 693. The defendant bears the burden of demonstrating that his attorney's performance was "so deficient that it fell below an objective standard of reasonableness." Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002). "Judicial scrutiny of a counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. A defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.; see also Murtishaw v.

Woodford, 255 F.3d 926, 939 (9th Cir. 2001)(Defendant "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.").

To establish prejudice the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. "It is not enough for [a defendant] to show that the errors had some conceivable effect on the outcome of the proceedings. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceedings." Id. at 693.

A court need not determine whether counsel's performance was deficient before examining the prejudice suggested by the defendant as a result of the alleged deficiencies. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness of counsel claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Strickland at 697.

To succeed on a claim of ineffective assistance from appellate counsel, defendant must show that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that but for counsel's unprofessional errors, the defendant would have prevailed on appeal.  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).  An appellate counsel has no obligation to raises every non-frivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  Appellate counsel's failure to raise an issue on appeal does not constitute ineffective assistance of counsel if counsel had no reasonable likelihood of success in arguing the issue.  Morrison v. Estelle, 981 F.2d 425, 427-28 (9th Cir. 1992).

**Findings of Fact**

### A.    The Plea Agreement

Reyes acknowledges signing on page 19 of the 20 page plea agreement.  The plea agreement recites that the document contains the complete agreement, understanding, promise or condition existing between the government and the defendant. The plea agreement recites that the sentencing guidelines apply. Pursuant to the agreement Reyes agreed to plead guilty to Count 7 of the First Superseding Indictment charging distribution of cocaine base.  The government agreed to dismiss Count 1 charging cocaine conspiracy.  The agreement recites that there are no guarantees or specific promises regarding the relevant conduct,

downward departure or a final sentencing range. It states that the defendant cannot withdraw from the agreement if he does not like his sentence. The government also agreed not to prosecute the defendant further for any offense arising out of the subject of the investigation.

The argument specifically recites that the government does not believe that Reyes meets the criteria under U.S.S.G. § 5C1.2, the "safety valve" provision, in that "he has failed to truthfully provide to the government all information the defendant has concerning the offenses that were part of the same course of conduct with which he was charged." The agreement provided that if he did so prior to sentencing the government "may recommend" that the safety valve applies. Reyes was free to argue for the safety valve at sentencing. Under the plea agreement the estimated guideline application provided for a non-binding estimated total offense level of 25 after allowing 3 points downward for the acceptance of responsibility. Reyes' estimated criminal history was Category I. Under these calculations the non-binding estimated sentencing range was 60 to 71 months.

The plea agreement recites the elements of the offense as charged in Count 7 and provides a factual basis for the plea of guilty. The factual basis included statements that on or about June 11, 2002 Reyes knowingly sold approximately 27.5 grams of cocaine base to an informant who was under the supervision and surveillance of law enforcement officers. The agreement recites

that Herman Walker has explained the charge to which Reyes was pleading guilty including the necessary elements and consequences of his plea. The agreement recited the rights given up by Reyes by pleading guilty and acknowledged that he was admitting the allegations against him in Count 7 and the factual basis for his plea.

The agreement explains the waiver of the right to appeal the conviction and states that Reyes is fully satisfied with the representation given him by his attorney, Herman Walker. The agreement recites that his attorney has "fully explain[ed] the legal and factual issues involved in [his] case to [his] satisfaction." The agreement recites that the defendant and his attorney have discussed the sentencing calculations under the guidelines as well as the sentencing estimates prepared by the government contained in the agreement.

Under the agreement Reyes acknowledged that no one including his attorney could guarantee him the outcome of his case or what sentence the court might impose if he pled guilty. Reyes acknowledged that the ultimate discretion to determine the sentence lay with the court. The agreement stated: "I understand the United States has not guaranteed me a motion for a substantial assistance departure and the court is not bound to grant such a motion if the court filed one." Plea Agreement, p.17. The agreement also stated: "I understand the consequences of my guilty plea." It stated that he understood that if he was not a citizen of the

United States he might be deported at the end of any sentence and that it would be a separate crime for him to attempt to reenter the United States without previously having obtained the permission of the Attorney General to apply for readmission. Plea Agreement, p.18.

### B.   Evidentiary Hearing

Julio Reyes was born in the Dominican Republic and has an eighth grade formal education. He has resided in the United States since May 1985. After Herman Walker was appointed to represent Reyes in the instant case Mr. Walker made several visits to Reyes at the jail facility using an interpreter. Mr. Walker followed his practice of not pressuring a defendant to plead guilty. He waited until receiving discovery from the government to assess the strength of the government's case-in-chief before talking with Mr. Reyes about pleading guilty.

Early in their contact Reyes told Walker that he thought that he was guilty (of some of the criminal conduct charged). Mr. Walker then counseled Reyes that it was in his interest to cooperate with the government. Reyes interpreted this advice as meaning that he had to provide information to the government agents. Mr. Walker produced three tapes he had obtained in discovery. Reyes told him that the information on the tape was true. Reyes asked his attorney what he thought was best for him. Mr. Walker said that if he did not cooperate he would likely get a higher sentence.

At the § 2255 evidentiary hearing Mr. Walker candidly stated that there were times during his communications with Reyes he felt that his attorney did not fully understand what was said initially. I accept Mr. Walker's statement that he went over matters more than once to make sure that Reyes did understand what he was saying.

Mr. Walker spoke to several defense attorneys for the co-defendants to try to "gauge" what they were doing in the case for their clients. After he evaluated the government's case Walker talked to Reyes about cooperating. By this time co-defendants had already cooperated with the government and Walker learned about this through their attorneys. Mr. Walker concluded that Reyes understood the plea agreement and that the agreement called for a sentence of 60 months.

At the evidentiary hearing Reyes testified that Walker told him that he could get between 36 and 48 months and for this reason he signed the plea agreement about three weeks later. Prior to sentencing Walker met with Reyes and discussed with him the content of the presentence report. Reyes understood that if he cooperated with the government agents that he could receive a sentence of less that 60 months. Reyes maintains that he did not know what was meant by the term "cooperating" and that he thought that his sentence might be 48 months if Walker talked with the judge. I expressly find that the prosecutor and government agents were willing to meet again with Reyes for further debriefing prior to

sentencing but Reyes never expressed the desire to do so. Reyes' explanation was that he thought that a further meeting was not necessary. Reyes now claims that he signed the plea agreement for 60 months because he expected that he would receive less time at sentencing. He claims he thought Walker would be able to get less time for him at sentencing. There is no factual basis for such a belief and I reject the argument that Reyes signed the plea agreement for 60 months with an expectation that he would necessarily receive less time when the actual sentence was imposed.

At the change of plea hearing it became apparent that Mr. Walker had not realized that the safety valve departure downward was still available after the change of plea hearing up until the time of the actual imposition of sentence. However, this misunderstanding of the law had no effect on Reyes' knowledge or expectation of receiving a downward departure when he actually signed the plea agreement. I conclude that Reyes rejected the opportunity to provide sufficient information to the government agents to qualify for the safety valve departure soon after the government indicated that they were not satisfied with the information provided by Reyes. I reject Reyes' testimony (Tr. 26-27) that he expected an 18 month sentence based on what his attorney had promised him. I reject as not credible the defendant's testimony that before he signed the plea agreement Walker told him that he could get 18 months (or less) at sentencing.

Reyes received the downward departure for acceptance of responsibility. To qualify for that downward departure he needed only to provide information about the offense conduct. At the initial debriefing Reyes provided some contradictory information. The agents had learned information from debriefing co-defendants that assisted them in evaluating the truthfulness and completeness of Reyes' information.

Walker discussed with Reyes the language in the plea agreement that stated that the government was of the view that he had not qualified for the safety valve. Mr. Walker tried to persuade Reyes to agree to "go back to the table" and provide additional information. Reyes declined to do so. Reyes took the position that he had nothing else to say or add and he did not want to continue with debriefing. Mr. Walker told Reyes that his co-defendants had cooperated and received lower sentences. I am satisfied that Reyes knew that he was likely to get a sixty month sentence when he appeared before the district judge at sentencing. Walker had gone over the draft and final presentence reports with Reyes.

Reyes argues that his attorney rendered deficient representation when he failed to pursue access to co-defendant's presentence reports to learn more about the extent of their cooperation with government agents. There is no evident or statutory or case authority to support a defendant being able to obtain through discovery the content of a co-defendant's presentence report. Presentence reports

are not public documents. Mr. Walker would ordinarily be precluded by confidentiality requirements from looking at presentence reports of co-defendants. I reject the defense argument that the government had a Brady obligation to provide Walker with a description of the information they had learned from co-defendants from other debriefing.[3] Aside from whether that would have been useful to Reyes no case authority has been provided to substantiate this legal contention. Brady and its progeny require the government to provide exculpatory information including information that relates to the sentencing of the defendant for the conduct charged or to which he has pled guilty. Brady does not require the government to disclose information that might be useful to the defendant in determining what information the government already knew thus compromising the government's ability to determine whether the defendant was telling the truth in his statements.

  The government was not required by law to provide Mr. Walker or Mr. Reyes with what information they thought was missing from Reyes' debriefing. Such information was not discoverable under Federal Criminal Rule 16 nor material to punishment under Brady and its progeny, even though it might have encouraged Reyes to provide more information than he did if he knew that the government already knew about certain other criminal activity or specific transactions.

//

---

[3] Brady v. Maryland, 373 U.S. 83 (1963).

Walker advised Reyes of the possible sentence he would receive if he pled guilty. He had the entire plea agreement translated into Spanish line by line and made a concerted effort to determine that Reyes understood the plea agreement. Mr. Walker stated that he might have explained the meaning of safety valve to Reyes rather than use the term "safety valve" in his communications with Reyes. In his sentencing memorandum Walker argued for a sentence of 36 to 48 months, that is, for one lower than the five year mandatory, based on Reyes' minor role and participation in the criminal activity.

At the imposition of sentence Mr. Walker stated that he had reviewed the presentence report and discussed it with Reyes. Mr. Reyes was asked a similar question by the judge and stated that he had discussed the presentence report with Mr. Walker. Judge Holland indicated that since the quantity of cocaine exceeded the threshold amount for the statutory mandatory sixty month sentence the role of the defendant was really a moot point. The judge had already sentenced co-defendants in the case and from his knowledge of the presentence report relating to Mr. Reyes' wife, Altagracia Esther Perdomo, he had the impression that Reyes was actually more involved than the presentence report in Mr. Reyes' case suggested.

The judge was puzzled by the fact Mr. Walker was seeking a downward departure from a mandatory minimum sentence without the defendant Mr. Reyes,

qualifying for the safety valve. Mr. Walker proceeded to argue for a downward departure because of the minimum culpability of Reyes' involvement in the conspiracy and his legitimate work as a dishwasher at the Peanut Farm until the charges were brought. Walker argued that Reyes could not tell the agents any more than what he told them. Walker told the judge that Reyes knew what his wife was doing and tried to stop her.

The prosecutor, James Barkley, took the position that in fairness to Reyes and what the court had done in another case (Pagoaga) by ruling that she qualified for the safety valve and received a 2 level adjustment downward for the role of the offense, the court could still consider whether Reyes qualified for a minor role departure downward. Sentencing Transcript, p.12. The court expressed the desire to learn more about the defendant's involvement in the transaction for which he had pled guilty.

The government then called FBI agent John Ekstein. He testified as to Reyes' role in the distribution of crack cocaine on or about June 11, 2002. The agent testified about a cooperating witness (CW) observing Reyes pull cocaine out of his sock and provide the cocaine to the CW during an undercover transaction. The agent also related the information from an interview with Reyes' wife, Altagracia Esther Perdomo, who talked about Mr. Reyes' involvement with her in the drug business. The information was confirmed by Perdomo's daughter who told the

agents about Reyes' involvement in selling cocaine with his wife for several years. The agent also related recorded telephone calls in which Reyes answered the telephone in Perdomo's absence and talked with the CW. On cross-examination Mr. Walker brought out the fact that out of 30 buys done by the CW only one had been done with Reyes. At Reyes's debriefing he talked only about that single involvement. Sentencing Transcript, p.20.

      The government brought out that cocaine was found in the house where Reyes and his wife resided on November 7, 2002. After hearing the testimony Judge Holland denied the request for a §3B1.2 departure reciting his satisfaction that Reyes was involved in ways other than the single hand-to-hand to which he had admitted. The court then determined the total offense level before any possible departure to be 25. Mr. Walker was given a final opportunity to argue for a departure. The court considered the "role" argument as to whether or not the case fit within the so-called <u>Heartland</u> case or whether it constituted abhorrent behavior. The court ruled that the abhorrent behavior addressed in Guideline §5K2.3 did not apply because of the nature of the criminal charge. The court then considered whether the §5K2.0 general departure guideline could apply but ruled that it did not because Reyes's role was one which was really quite typical of family members who were caught up the drug dealing of spouses. Thus, it constituted a <u>Heartland</u> situation for sentencing purposes.

## Conclusions

Mr. Reyes had ample opportunity to pursue the safety valve departure. He had an opportunity after the prosecutor stated in open court that the only thing keeping him from the safety valve which might get him a sentence below the mandatory minimum was the fact that he had not been truthful about what was involved in the drug activities. The prosecutor stated that he could still do that prior to sentencing and qualify. Mr. Walker stated at the change of plea hearing that he intended to have further discussions with Mr. Reyes regarding that opportunity. At the evidentiary hearing Mr. Walker testified that he did have such discussions, but Reyes was unwilling to submit himself to further debriefing. I accept Mr. Walker's testimony as truthful and conclude that Reyes did have ample opportunity to qualify for the downward departure below the mandatory minimum 60 months.

At the evidentiary hearing Mr. Reyes repeatedly stated that he did not lie and would not lie in answer to the agent's questions merely to obtain a lower sentence. However, the government's view that he was not truthful based upon the fact that he did not come forward to tell the complete truth, not that what he said was necessarily untruthful. I find that Mr. Walker had ample visits with Mr. Reyes and utilized an interpreter to explain his advice to him. The testimony of Agent Epstein at the sentencing hearing provides adequate substantiation that the government had sufficient reason for concluding that Reyes knew more about the drug transactions

than he was telling them.  The safety valve addresses a defendant's voluntary statements to the government; the government has no burden to draw particularly helpful information from a defendant who is reluctant to discuss the events.

Reyes complains that his attorney asked the court to sentence him to the 60 month mandatory minimum sentence.  However, that statement occurred after Judge Holland had made the rulings mentioned above and there was no legal basis for asking the judge for a lower sentence.  Mr. Walker was asking the court to impose the minimum mandatory sentence rather than a higher sentence.  Under the circumstances it appears that Mr. Walker argued ably on behalf of his client and that he allowed Mr. Reyes to decide for himself whether to submit to further debriefing in an attempt to qualify for the safety valve downward departure.

If indeed it was Mr. Reyes's understanding that his lawyer had to do something rather than himself for him to qualify for the safety valve there is no rational basis for such understanding.  I am satisfied that Mr. Walker sufficiently explained to Reyes what he had to do to qualify for the safety valve.  This is not a case where the defendant was willing to cooperate but his attorney dropped the ball in assisting him in arranging for the necessary debriefing.  Reyes has not met his burden of showing that his attorney Herman Walker rendered deficient representation and that the attorney's representation prejudiced his cause.  The

motion for relief under 28 U.S.C. § 2255 lacks merit and should be denied. IT IS SO RECOMMENDED.

DATED this 2nd day of May, 2006, at Anchorage, Alaska.

/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON, May 24, 2006**, to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON, May 31, 2006**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).